Elmer **FLORES, Jose Gonzalez Rodriguez, Ramon Benitez, Jaime Velasquez, Edwin Hernandez, Paola Pineda, Lilian Fuentes, Edwin Esquivel, and Fred Fuentes, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**MAMMA LOMBARDI'S OF HOLBROOK, INC., 600 South Ocean Operating Corp. d/b/a Lombardi's on the Bay, Lombardi's on the Sound, QCG, Inc. d/b/a Villa Lombardi's, Lombardi's Gourmet Market, Qurino Lombardi, Jerry Lombardi, Josephine Lombardi Papadakis, Filomena Lombardi and Guy Lombardi, Defendants.**

**No. CV 12–3532(GRB).**

United States District Court, E.D. New York.

Signed May 18, 2015.

294

Peter Arcadio Romero, Neil Frank, Frank & Associates, P.C., Farmingdale, NY, for Plaintiffs.

Misael Cruz, pro se.

Carlo Raucci, pro se.

Henry Inga, pro se.

Jose A. Guevara, pro se.

Paul Keil, pro se.

Nelson E. Cruz, pro se.

Ulises Herrera, pro se.

Santos Munguia–Garcia, pro se.

Jose Adalid Lozano Garcia, pro se.

Reina Esmeralda Rivera, pro se.

Maria Benavides, pro se.

Jose R. Hernandez, pro se.

Daniel A. Velasquez, pro se.

John Jr Cardallo, pro se.

Edwin Mejia Garcia, pro se.

Bayron A. Guillen, pro se.

Mejia Freecncio, pro se.

Olvin Vasquez, pro se.

Jose Fausto Zavala, pro se.

Johel A Guillen, pro se.

Rosario Saravio, pro se.

Yadira Carrasco, pro se.

Robert D. Lipman, David A. Robins, Lipman & Plesur, LLP, Jericho, NY, for Defendants.

## MEMORANDUM & ORDER

GARY R. BROWN, United States Magistrate Judge:

*The danger to workers from underpayment by their employers is clear.*

*The danger of overpaying their lawyers is more subtle.*

—Honorable William Pauley III,

*Fujiwara v. Sushi Yasuda Ltd.,*

58 F.Supp.3d 424, 429–30 (S.D.N.Y. 2014)

In this FLSA matter, the parties have filed motions to, among other things, approve (1) a class action settlement of $1.375 million to a class of more than 4,000 restaurant workers who were unlawfully denied overtime compensation for hours worked, and (2) an award of one-third of that settlement fund as attorneys' fees to class counsel on parties' consent. Notwithstanding objections filed by several class members, the Court approves the settlement with little difficulty as it constitutes a substantial and beneficial resolution for class members. The award of a third of that fund to counsel, however, presents much greater concerns. The effort expended by counsel does not justify the princely sum sought. Counsel's conduct—including the undisclosed participation by an attorney representing the class in the drafting of objections to the

very settlement he negotiated on behalf of the class—raises issues about the quality of the representation. Counsel further bills for matters that are clearly impermissible and attempts to charge hourly rates dramatically higher than it has sought in other similar matters. And counsel's insistence upon the award of this contingent percentage—without taking into account the lodestar calculation and other factors identified by the Second Circuit and the U.S. Supreme Court—clearly misstates existing law.

As such, for the reasons set forth below, the motion to approve the settlement is granted. The motion for an attorneys' fees award, in light of the peculiarities of this case, is granted in part, but with significant reductions.

### Background

As described in this Court's July 14, 2014 Order, which preliminarily approved a class action settlement[1] and is incorporated by reference (hereinafter "July 14 Order" or "Preliminary Approval Order"), Docket Entry ("DE") 135, plaintiffs Elmer Flores, Jose Gonzalez Rodriguez, Ramon Benitez, Jaime Velasquez, Edwin Hernandez, Paola Pineda, Lilian Fuentes, Edwin Esquivel and Fred Fuentes (collectively, "plaintiffs") brought this action against their former employers, Mamma Lombardi's of Holbrook, Inc., 600 South Ocean Operating Corp. d/b/a Lombardi's on the Bay, Lombardi's on the Sound, QCG Inc. d/b/a Villa Lombardi's, Lombardi's Gourmet Market, Qurino Lombardi, Jerry Lombardi, Josephine Lombardi Papadakis, Filomena Lombardi and Guy Lombardi (collectively, "defendants") on behalf of themselves and all others similarly situated under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., ("FLSA") and similar

---

1. In addition, the Court conditionally certified the settlement class, appointed plaintiffs' counsel as class counsel, and authorized the mailing of a notice. DE 135.

state labor laws. *See generally* Complaint ("Compl."), July 17, 2012, DE 1, *see also* Third Amended Complaint ("Am. Compl."), June 6, 2013, DE 90. Defendants operate several restaurants on Long Island. The potential class members have been notified of the proposed terms of settlement and their right to opt out of or object to the settlement. Romero Decl. ¶ 5, DE 151. Out of a total of 4,123 potential class members, three filed objections and one opted out of the settlement. *Id.* Pursuant to Fed.R.Civ.P. 23(e), the Court held a Fairness Hearing on November 12, 2014 to discuss the terms of the settlement and to provide an opportunity for objections to be heard.

Before the Court is a joint application for: (1) final certification of the settlement class; (2) final approval of the class action settlement and FLSA settlement of this action; (3) approval of counsel fees and costs; (4) approval of administration fees; and (5) a service award of $10,000 to Class Representative Elmer Flores ("Flores"). For the reasons set forth herein, plaintiffs' motion for final certification of the settlement class and for approval of the class action settlement and FLSA settlement is granted. In addition, plaintiffs' application for attorney's fees and costs is granted, in part. Finally, plaintiffs' request for administration fees and for a service award to plaintiff Flores is granted.

**Terms of the Settlement and the Objections Thereto**

The parties have agreed to settle this wage and hour collective and class action brought under the FLSA and NYLL for $1,375,000.00. *See* Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Mem. of Law"), at 1, DE 149–4. Each eligible class member who has not opted-out of the lawsuit and who timely filed a claim form will be entitled to receive a pro-rata share of the net settlement amount in accordance with the following formula:

> Back of the House Class Members (including, but not limited to, those who worked preparing and/or cooking food, washing dishes, cleaning and/or maintaining the premises and unloading trucks) ("BOH") claims shall be computed by first determining each BOH Class Member's total weeks working during the Settlement Period, as determined by the Settlement Administrator, then calculating each BOH Class Member's total weeks worked as a percentage of the total gross weeks worked for the BOH Settlement Class (53,768 weeks), and then multiplying that percentage by 87.27% of the Net Settlement Amount.
>
> Front of the House Class Members (including, but not limited to, those who worked bussing tables and serving food) ("FOH") claims shall be computed by first determining such FOH Class Member's total weeks worked during the Settlement Period, as determined by the Settlement Administrator, then calculating each FOH Class Member's total weeks worked as a percentage of the total gross weeks worked of the FOH Settlement Class (91,744), then multiplying that percentage by 12.73% of the Net Settlement Amount.

*Id.* at 8–9.

Three class members—Nicholas Plume, Alexandra Davino, and David Maug—filed objections to the settlement. *See generally* Tilton Decl., DE 143.[2] Plume and Davi-

---

**2.** Counsel for the objectors states "On July 9, 2014, the undersigned wrote to the Court presiding over this matter and requested a promotion [sic] conference in order to discuss

Mr. Plume's and Ms. Davino's desire to file a brief opposing the then pending motion for preliminary approval of a class action settlement, which was previously filed on Decem-

no filed a separate complaint against several of the defendants similarly alleging FLSA and NYLL violations. *See* 14-CV-4213. As their attorney acknowledges, these "allegations are similar to those made by the parties to the *Flores* matter which is currently before the Court." Tilton Decl., DE 143, ¶ 4. In addition, however, these plaintiffs "allege a claim under NYLL § 196d, which prohibits employers from retaining any charge purported to be a gratuity." *Id.* at ¶ 5. The objectors contend that (1) this claim is not asserted in the instant complaint, though the general release would embrace such a claim; and (2) "the *Flores* plaintiffs are all employees who worked in [d]efendants' kitchens as cooks or food preparers, and not servers, who do not receive gratuities and, hence, could not have possibly known about or raised any complaint regarding the misappropriation of gratuities under NYLL § 196d." *Id.* at ¶ 7.

## DISCUSSION

### I. Approval of the Settlement

### A. Final Certification of the Settlement Class

■ The requirements for certification of a class under Fed.R.Civ.P. 23 were set forth in detail in the July 14 Order, which provisionally certified the class for settlement purposes. *See* Preliminary Approval Order, at 6–10. Applying these principles, the proposed settlement meets all the requirements of Rule 23.

First, the settlement class consists of 4,123 class members, *see* Romero Decl. ¶ 5, and thus is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Second, all class members were employees of defendants and claim that defendants failed to pay them the proper wages for all hours worked. *See* Am. Compl. ¶ 6. All of the claims are similar and arise under the FLSA and NYLL and there are thus "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Third, the claims of the named plaintiffs are "typical of the claims or defenses of the class," Fed.R.Civ.P. 23(a)(3), because they are sufficiently similar to those FLSA and NYLL claims made by other class members. Fourth, there is no reason to believe that the interests of the named plaintiffs are at odds with the class members', and therefore can "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).

The class also satisfies Fed.R.Civ.P. 23(b)(3). Common questions predominate because class members' legal theories under the FLSA and NYLL are the same in this case and arise from defendants' common and uniform policies, practices and procedures of failing to pay class members proper wages for all hours worked. *See* Am. Compl. ¶¶ 124, 134–35. The settlement class is unified by common factual allegations, including that they were compensated at a rate below the minimum wage, were not paid overtime compensation for hours worked in excess of 40 hours per week, were not paid spread of hours compensation, and did not receive proper wage statements. *Id.* at ¶¶ 144–170. This commonality is sufficient to overcome any minor variations in the plaintiffs' individual

---

ber 6, 2013.... On July 11, 2014, the Court denied the undersigned's request for a promotion [sic] conference." Tilton Decl. ¶¶ 9–10. Not exactly. In fact, counsel requested—and the Court denied—that consideration of the pending motion for preliminary approval of the class action settlement be stayed pend-

ing the filing of a brief by the objectors to relate the two cases and oppose the settlement. Electronic Order dated July 11, 2014. In any event, the objectors can claim no prejudice from this decision, as they have been afforded and utilized a full and fair opportunity to oppose the class action settlement.

situations and the need for individualized damages calculations.

Moreover, a class action is the superior method of adjudicating this controversy because the plaintiffs and class members have limited financial resources, lack the means to prosecute individual actions, are likely to be similarly situated, and there is no evidence that class members would have a strong interest in controlling the suit themselves. Mem. of Law at 15. Finally, a class action conserves resources and vindicates the rights of class members for whom individual suits might not be economically worthwhile. In sum, a class action is the most suitable mechanism to fairly, adequately and efficiently resolve the class members' claims against defendants. Accordingly, plaintiffs' motion for final certification of the settlement class is hereby granted.

## B. Adequacy of Notice to the Class

In the July 14 Order, the Court approved plaintiffs' proposed Notice to the settlement class. See Preliminary Approval Order at 10–11. The July 14 Order found that the Notice "satisfies each of the requirements of Rule 23(c)(2)(B) and adequately puts class members on notice of the proposed settlement." Id. at 11. Under the direction of class counsel, the settlement administrator, Simpluris, Inc., sent the notice to all 4,123 class members informing them of their right to opt out of or object to the settlement and of class counsel's intention to seek a service award in the amount of $10,000 for plaintiff Flores, $458,333 in attorneys' fees and up to $1,200 for expenses. Romero Decl. ¶¶ 33–34; see also DE 152. Three Class members filed timely objections; one class member requested exclusion; and no class member objected to the service awards or counsel's request for fees and costs.

The Court confirms its prior approval of the Notice, holding it was fair and adequate to apprise potential class members of the settlement. Additionally, the Court concludes that the process by which the Notice was distributed complies with all requirements, including constitutionally required due process.

## C. Approval of Class Action Settlement

■ Any compromise of claims brought on a class basis requires judicial review pursuant to Rule 23(e). Approval of a proposed settlement is a matter within the trial court's discretion, exercised in recognition of the policy encouraging settlement of disputed claims. See Joel A. v. Giuliani, 218 F.3d 132, 139 (2d Cir.2000). In exercising its discretion, a court should be mindful of the "strong judicial policy in favor of settlements, particularly in the class action context." Wal–Mart Stores, Inc. v. Visa U.S.A, Inc., 396 F.3d 96, 116 (2d Cir.2005). To determine whether a class settlement is fair, a court must examine both the settlement's procedural and substantive fairness. See Hayes v. Harmony Gold Mining Co., 509 Fed.Appx. 21, 22 (2d Cir.2013).

### 1. Procedural Fairness

■ The procedural fairness inquiry requires the court to scrutinize the negotiation process "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." Payment Card Interchange Fee & Merch. Discount Antitrust Litig., 986 F.Supp.2d 207, 221 (E.D.N.Y.2013) (internal quotation marks and citations omitted). There is a presumption of procedural fairness "as to the settlement where a class settlement [is] reached in arm's length negotiations between experienced,

capable counsel after meaningful discovery." *McReynolds v. Richards–Cantave,* 588 F.3d 790, 803 (2d Cir.2009) (internal quotation marks and citation omitted). Indeed, "absent evidence of fraud or overreaching [courts] consistently have refused to act as Monday Morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.,* 840. F.Supp. 277, 281 (S.D.N.Y.1993).

■ In the instant case, the Settlement Agreement is the result of extensive, serious and informed negotiations facilitated and monitored by the undersigned between plaintiffs and defendants, who are well versed in wage and hour class litigation. The proposed settlement was negotiated at arm's length after a thorough evaluation of the claims, including class counsel's interview of dozens of class members regarding the facts and details of their employment with defendants as well as a review of extensive payroll data. *See* Mem. of Law at 17. The parties engaged in lengthy and vigorous (if sometimes overly protracted) negotiations. *See* Romero Decl. ¶¶ 12–31. Moreover, the undersigned can attest to the propriety of the negotiations, as many of the terms were negotiated at several court-supervised conferences at which the undersigned presided. Given the nature of the allegations, the business, the size of the class and financial situation of the defendant, the terms of the settlement are fair, adequate and reasonable. Particularly when compared to more typical FLSA settlements—which are often informed by the precarious financial situation of the defendant—the terms of this settlement reflect a more even playing field. *See Picerni v. Bilingual Seit & Preschool Inc.,* 925 F.Supp.2d 368, 377 (E.D.N.Y.2013) (noting that in the "vast majority of FLSA cases ... the employer's finances [are] marginal"). In light of these facts, the Court

finds that the settlement is entitled to the presumption of procedural fairness.

## 2. Substantive Fairness

■ Substantive fairness of a proposed settlement is evaluated under the factors enumerated in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974). *See Hayes,* 509 Fed.Appx. at 22. This analytical framework includes the following *Grinnell* factors: (a) the complexity, expense and likely duration of the litigation; (b) the reaction of the class to the settlement; (c) the stage of the proceedings and the amount of discovery completed; (d) the risks of establishing liability, damages, and maintaining the class action through the trial; (e) the ability of the of the defendants to withstand a greater judgment; (f) the range of reasonableness of the settlement fund in light of the best possible recovery and all attendant risks of the litigation. *Id.; see McReynolds,* 588 F.3d at 804. A review of the settlement's substantive terms in light of the *Grinnell* factors reveals that the settlement is substantively fair, reasonable and adequate.

### a. Complexity, Expense and Likely Duration of Litigation

■ Though not particularly complex, this class action—involving two classes of more than 4,000 of defendants' employees—would undoubtedly continue for a substantial period of time. Further litigation would result in additional expense, including costly depositions of opt-in plaintiffs and others, motion practice, trial preparation, trial and appeal, that could meaningfully decrease possible recovery for plaintiffs. *See Romero v. La Revise Assocs., L.L.C.,* 58 F.Supp.3d 411, 420–21 (S.D.N.Y.2014) (finding in an FLSA and NYLL action, "the large number of class members and the fact-intensive nature of their claims mean that litigation would

likely be lengthy, complex, and expensive"); *Fujiwara v. Sushi Yasuda Ltd.*, 58 F.Supp.3d 424, 432 (S.D.N.Y.2014) ("Wage and hour cases are not unduly complex"). Accordingly, this factor weighs in favor of settlement because litigation through trial would be expensive and long.

### b. The Reaction of the Class to the Settlement

"Courts have found this factor to weigh in favor of approval where the majority of class members have not objected to or opted out of a settlement." *In re Sinus Buster Prods. Consumer Litig.*, No. 12–CV–2429 (ADS)(AKT), 2014 WL 5819921, at *9 (E.D.N.Y. Nov. 10, 2014); *see, e.g., Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir.2005) ("But here, the absence of substantial opposition is indicative of class approval"); *Dupler v. Costco Wholesale Corp.*, 705 F.Supp.2d 231, 239 (E.D.N.Y.2010) ("Of the 11,800,-514 class members, only 127 opted out and 24 objected. Such a small number of class members seeking exclusion or objecting indicates an overwhelmingly positive reaction of the class").

Here, the class's reaction to the settlement was positive. The Notices sent to 4,123 class members included an explanation of the terms of the Settlement and informed class members of their right to object to the Settlement or exclude themselves from the Settlement and explained the appropriate steps to follow. Only one class member opted out, and three class members filed objections to the settlement, to wit, Nicholas Plume, Alexandra Davino and David Maug (hereinafter the "plaintiff-objectors"). Romero Decl. ¶ 5. Two of the objectors, Plume and Davino (the "*Plume* objectors") commenced a parallel action, *Plume v. QCG, Inc.*, CV 14–4213(JS) on July 9, 2014, alleging similar FLSA and NYLL claims as in the instant action, and a claim under NYLL § 196–d, which prohibits employers from retaining any charge purported to be a gratuity.[3] Curiously, the *Plume* objectors, rather than opting out of this lawsuit, submitted claim forms that specifically provide that they are opting into this lawsuit under the FLSA and state law and releasing all wage-related claims against defendants.[4]

With regard to the objections, the Court has carefully reviewed the written objec-

**3.** The Frank firm, counsel for class plaintiffs herein, also filed a notice of appearance on behalf of plaintiffs in the *Plume* litigation, the objectors herein. According to representations by counsel, remarkably, counsel for class plaintiffs also had some role in the preparation and filing of those objections. Tr. at 28–30, DE 157. Just prior to the fairness hearing, the Frank firm filed a motion to withdraw as counsel for plaintiffs in *Plume*, which motion was granted by Judge Seybert on November 12, 2014, the date of the fairness hearing. *See Plume v. QCG, Inc.*, CV 14–4213(GRB), DE 21. These matters are discussed further *infra*.

**4.** In the proposed Settlement Agreement which was provided to all class members, the release includes in relevant part:

Any and all claims that were or could have been asserted in the Lawsuit including but

not limited to claims in arbitration, demands, causes of action or liabilities, or whatever kind or nature for any alleged (i) failure to pay appropriate wages for all hours worked (including but not limited to minimum and overtime wages as well as spread of hours pay), employee benefits, bonuses, commissions under the Fair Labor Standards Act and New York Labor Law at any point from July 17, 2006 to the entry of judgment in this case; (ii) deductions from wages or gratuities under the New York Labor Law at any point from July 17, 2006 to the entry of judgment in this case ... and (iii) any other violations, under the New York Labor Law at any point from July 17, 2006 to the entry of judgment in this case.

Tilton Decl., Ex. 1 at 5–6; 129–2.

tions and has considered the objectors' concerns raised at the fairness hearing. Because the objections simply do not undermine the wisdom of the proposed compromise, they are overruled. *See Authors Guild v. Google, Inc.*, 770 F.Supp.2d 666, 675 (S.D.N.Y.2011) (holding that "when evaluating a settlement agreement, the court is not to substitute its judgment for that of the parties, nor is it to run consideration of the adequacy of the settlement into a trial or a rehearsal of the trial ... Rather, the [c]ourt's responsibility is to reach an intelligent and objective opinion of the ultimate success should the claims be litigated and to form an educated estimate of the complexity, expense and likely duration of such litigation and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise").

As a preliminary matter, the plaintiff-objectors' assertion that the "purported collective action members are all kitchen employees," that is to say BOH class members and not FOH workers, is simply untrue. *See* Objections to Class Action Settlement, DE 142 at 6–7. Several class members, including a named plaintiff, were FOH members, to wit: named plaintiff Ramon Benitz and opt-in plaintiffs Antonio Alvarado Garcia and Johel Guillen worked as a busboys, DE 90;151–3; 151–4; opt-in plaintiffs Irbin Lazo, Paul Kiel, III and Carlo Raucci worked as waiters, DE 151–6; 151–5; 151–9; opt-in plaintiffs Innocence Mejia, Juan Carlos Hernandez Perez and Jose Fausto Zavala worked as busboys and food runners, DE 151–7;151–8; 151–11; and opt-in plaintiff Daniel Velasquez worked as a busboy and server. DE 151–10.

Substantively, the principal objections largely turn on the contention that the settlement fails to account for a claim raised under Section 196–d of the New York Labor Law (the "196–d claim") relating to defendants' catering business. That section provides as follows:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.

N.Y.L.L. § 196–d. The *Plume* plaintiffs argue as follows:

> The New York State Department of Labor, the agency charged with administering the NYLL, has issued regulations which create "a rebuttable presumption that any administering the NYLL, has issued regulations which create "a rebuttable presumption that any charge in addition to charges for food, beverage, lodging, and other specified materials or services, including but not limited to any charge for 'service' or 'food service,' is a charge purported to be a gratuity." 12 N.Y.C.R.R. § 146–2.18(b). Further, "[a] charge purported to be a gratuity must be distributed in full as gratuities to the service employees or food service workers who provided the service" in order to comply with the provisions of section 196–d. 12 N.Y.C.R.R. § 146–2.18(a). The basis for the servers' claim, as the Plume complaint alleges, is that Lombardi's automatically added an 18% "service charge" on their customers' bills for catered events, which the servers allege constitutes a charge "purported to be a gratuity for an employee" within the meaning of section 196–d, yet did not distribute those monies to the servers in violation of the statute and its implementing regulations.

DE 142 at 8–9.

At the fairness hearing, the Court explored in detail the gratuity service charge issue raised by the plaintiff-objectors, *viz.*

that "there was a misappropriation of 18% of the entire catering revenue." Tr. at 22. Having examined approximately 125 contracts, counsel for the plaintiff-objectors produced only two contracts (and corresponding final bills) to support their position that the service charge was not clearly identified as something other than a gratuity. *Id.* at 22–24, 37–38. Each of the two catering contracts contained the heading "Contract" with a line for "Service Charge Add'l" and a handwritten notation with the words: "20% (not a gratuity)." However, counsel pointed out that the corresponding invoices for those contracts contained a line for "% Service Charge" and a handwritten notation of "20." Thus, plaintiff-objectors rely solely upon the invoices—to the exclusion of the contracts—to support their 196-d claim. The argument is unpersuasive.

The contours of the agreement between the defendants and their catering clients is defined by the written contract between them, and those contracts unambiguously defines the service charge as "not a gratuity." That the corresponding invoice—which by its nature is less detailed than the contract—does not include this language is of no moment. *Tanenbaum Textile Co. v. Schlanger*, 287 N.Y. 400, 40 N.E.2d 225, 226 (1942) ("An invoice, as such, is no contract"). This is particularly true where, as here, the critical term is not a question of agreement as much as notice to the consumer about the nature of the charge. In other words, that the invoice did not reiterate the definition of the service charge contained in the contract did not obliterate this information from the mind of the buyer.

Moreover, even assuming the invoices suggest an issue, the evidence demonstrates that the extent of the issue is negligible. Class counsel reviewed "literally hundreds of these contracts, all of which

clearly indicate on the contract itself 'not a gratuity.'" *Id.* at 1, 27. Further, the Settlement Notice provided to all class members clearly references claims under the NYLL, including the word "gratuities," and all wage related claims, and provided class members with the option to opt-out and assert their claim. Notably, apart from the three objectors, no other FOH employees who received the Notice made such objections. Under these circumstances, the objections fail to indicate that the proposed settlement is unfair.

To the contrary, the fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable and adequate. *See Davis v. J.P. Morgan Chase & Co.*, 827 F.Supp.2d 172, 177 (W.D.N.Y.2011) (granting final approval and noting "very little negative reaction by class members to the proposed settlement" where 11 out of 3,800 class members opted out and 3 objected); *Wright v. Stern*, 553 F.Supp.2d 337, 344–45 (S.D.N.Y.2008) (approving settlement where 13 out of 3,500 class members objected and 3 opted out, noting that the "fact that the vast majority of class members neither objected nor opted out is a strong indication" of fairness). Therefore, this favorable response evidences the general approval of the class and weighs in favor of final approval.

### c. Stage of Proceedings and Discovery Completed

■ In turning to the third factor, the Court has considered whether class plaintiffs "had sufficient information on the merits of the case to enter into a settlement agreement, and whether the Court has sufficient information to evaluate such settlement." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F.Supp.2d 207, 224 (E.D.N.Y.2013) (citations omitted); *see Siler v. Landry's Seafood House–North Car-*

*olina, Inc.*, No. 13–CV–587 (RLE), 2014 WL 2945796, at *7 (S.D.N.Y. June 30, 2014) ("[t]he pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating"). To satisfy this factor, the parties "need not have engaged in extensive discovery as long as they have engaged in sufficient investigation of the facts to enable the Court to intelligently make an appraisal of the settlement." *In re Sinus Buster Prods. Consumer Litig.*, 2014 WL 5819921, at *9 (internal quotation marks and citations omitted).

Here, the Court finds that the litigants conducted significant discovery prior to entering negotiations. Class counsel conducted in-depth interviews of dozens of Rule 23 class members, regarding the details of their employment with defendants. Romero Decl., ¶¶ 10, 26; *see* Mem. of Law at 19. During discovery, the parties produced and reviewed extensive payroll data and documents related to plaintiffs' claims. Romero Decl., ¶ 20; *see* Mem. of Law at 19. Thus, plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims and to accurately estimate the damages at issue. The parties' participation in mediation and extensive settlement negotiations, including multiple meetings between counsel as well as lengthy court-facilitated settlement conferences, allowed them to further explore and evaluate the claims and defenses. Romero Decl., ¶¶ 13–14, 16, 20–30; *see* Mem. of Law at 19. Thus, the third *Grinnell* factor weighs in favor of final approval.

#### d. The Risks Related to Liability, Damages and of Trial

As to the fourth factor, the risk of establishing liability and damages and of maintaining the class action through trial further militate in favor of final approval. "Litigation inherently involves risks." *Sil-*

*er*, 2014 WL 2945796, at *6 (internal quotation marks and citation omitted). "Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits." *Id.* (internal quotation marks and citations omitted). Thus, "[i]n assessing the Settlement, the Court should balance the benefits afforded the Class, including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation." *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452(RLE), 2014 WL 1777438, at *7 (S.D.N.Y. May 1, 2014) (internal quotation marks and citations omitted) (emphasis in original).

Here, plaintiffs face some—albeit not overwhelming—litigation risks. *See* Mem. of Law at 19–20. More importantly, absent this settlement, plaintiffs face the certainty of substantial costs and delays. Plaintiffs' counsel notes that in a litigation process, they "could very well recover less in damages than they will receive under the Settlement." *Id.* Settlement eliminates the risk, expense, and delay inherent in a continued litigation process.

#### e. Defendants' Ability to Withstand a Greater Judgment

"Courts have recognized that a Defendants' ability to pay is much less important than the other *Grinnell* factors, especially where the other factors weigh in favor of approving settlement." *In re Sinus Buster Prods. Consumer Litig.*, 2014 WL 5819921, at *11 (citations omitted). Indeed, "[e]ven if Defendants could have withstood a greater judgment, a defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Viafara*, 2014 WL 1777438, at *7 (internal quotation marks and citations omitted).

Nonetheless, this factor weighs in favor of final approval. Although class counsel does not opine on whether defendants are capable of withstanding a greater judg-

ment, *see* Mem. of Law at 20, defendants have declared (under penalty of perjury) that they are not able to withstand a greater judgment, given their limited financial resources, Lombardi Decl., DE [146], ¶¶ 3–4. This is consistent with the Court's observations in this matter, drawn from experience and common sense. *See* Tr. at 25–26 (observing that "$1.3 million is not a small amount of money," and that defendants are not a "publicly traded corporation [but rather] a couple of restaurants … a local establishment. Almost by definition, if we get to the phase where this would be worth $10 million, they're going to go bankrupt and then your clients get nothing"). Inasmuch as it appears that defendants would not be able to withstand a greater judgment, resolution of this action through one settlement class benefits all plaintiffs by increasing the likelihood of collection.

**f. Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Attendant Risks of Litigation**

■■■ "[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir.2005) (citation omitted). "In other words, the question for the Court is not whether the settlement represents the highest recovery possible … but whether it represents a reasonable one in light of the many uncertainties the class faces." *Bodon v. Domino's Pizza, LLC*, No. 09–CV–2941 (SLT), 2015 WL 588656, at *6 (E.D.N.Y. Jan. 16, 2015) (internal quotation marks and citation omitted).

Here, the size of the Settlement, *viz.* $1,375,000, provides support for its rea-

sonableness when viewed in light of the best possible recovery and all of the risks of litigation. Class counsel states that the settlement represents a significant percentage of the recovery that plaintiffs could have achieved had they prevailed at trial and survived an appeal. *See* Mem. of Law at 21. Additionally, when the settlement agreement assures immediate payment of substantial amounts to class members, "even if it means sacrificing 'speculative payment of hypothetically larger amount years down the road,'" settlement is reasonable under this factor. *Gilliam v. Addicts Rehab. Ctr. Fund*, 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (internal quotation marks and citation omitted). Thus, this factor weighs in favor of final approval.

In sum, the Court finds that the proposed Settlement Agreement is both procedurally and substantively fair. Accordingly, the Court hereby grants plaintiffs' motion for final approval and approves the settlement as set forth in the Settlement Agreement.

**D. Approval of the FLSA Settlement**

■■■ The parties also seek approval of the settlement insofar as it settles plaintiffs' claims under the FLSA. "Because, under the FLSA, parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date, FLSA collective actions do not implicate the same due process concerns as Rule 23 actions." *Viafara*, 2014 WL 1777438, at *7 (internal quotation marks and citations omitted). Therefore, the approval standard of an FLSA settlement is lower than the approval standard for a Rule 23 class action. *Id.* "Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes, and regard the adversarial nature of a litigated FLSA case to

be an adequate indicator of the fairness of the settlement." *Siler*, 2014 WL 2945796, at *6 (internal quotation marks and citations omitted). In short, "[i]f the proposed FLSA settlement reflects a reasonable compromise over contested issues, it should be approved." *Id.* (citations omitted).

▉▉ In the case at hand, the parties' settlement was the result of arm's length negotiation. *See* Mem. of Law at 22. During the litigation, the parties were represented by counsel experienced in wage and hour law, and counsel participated in numerous court-facilitated mediation sessions. *Id.* Under these circumstances, the Settlement Agreement resolves clear and actual disputes supporting a finding that it is fair and reasonable. Accordingly, the Court hereby approves the FLSA settlement.

## II. Attorney's Fees and Costs

Counsel filed an application for attorneys' fees amounting to a full third of the settlement fund—totaling $458,333.00. Review of the docket sheet reveals that this matter, though involving a large class and recovery, was relatively straightforward and involved limited motion practice. The contours of a settlement were reached early in the proceedings. To the extent this matter has been unnecessarily protracted, much of that is the fault of actions by class counsel. Nevertheless, counsel is seeking nearly a half million dollars from the fund.

Attorneys seeking court approval of fee awards in this Circuit must submit for the Court's review contemporaneous records of the date, the hours expended, and the nature of the work done, *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983), or a proxy for the same. *Cruz v. Local Union No. 3 of the IBEW*, 34 F.3d 1148, 1160 (2d Cir.

1994) (basing a fee award on "reconstructions of ... contemporaneous records" in attorney affidavits would "not [be] contrary to the dictates of *Carey*"). Counsel failed to do so here, a fact which, standing alone, provides a basis to deny the fee application in its entirety. *See, e.g., Camacho v. Ess–A–Bagel, Inc.*, 2014 WL 6985633, at *5 (S.D.N.Y.2014) (denying attorneys' fee application in FLSA case where counsel failed to submit time records). Additionally, in its application, counsel failed to provide adequate biographical information concerning the attorneys for whom charges were submitted, which is required to evaluate experience levels. However, as discussed further below, the undersigned allowed counsel to correct these deficiencies by filing the requisite information. See Electronic Order of 6/18/15; DE 148, 155.

### 1. Method of Calculating Reasonable Attorneys' Fees

▉▉ Fee applications in common fund cases can pit the interests of class counsel against those of the very class members they represent, without the benefit of the illumination provided by adversarial fire. *See Fujiwara*, 58 F.Supp.3d at 429–30 ("a natural tension arises between plaintiffs' attorneys and the class they represent, in that both must jockey for payment from a common fund [and] it is judges alone who are left to safeguard the interests of the class"). Indeed, in this case, because the Settlement Agreement provides that the formulae for BOH and FOH class members to be dependent on the Net Settlement Amount, and such amount varies according to attorney's fees and costs, an increase to the attorney's fee award results in a direct decrease to the amount distributed to the class. Settlement Agreement (A)(5)(c), DE 129–2; *see also* DE 149–4 at 8–9; 159 at ¶ 5. The lack of a robust adversarial process in fee applica-

tions further exacerbates this problem. In *Goldberger v. Integrated Resources, Inc.*, the Second Circuit held that because plaintiffs in common fund cases typically cannot negotiate collectively or at arm's length, and defendants have little interest in how the fee from the common fund is distributed, courts must "act as a fiduciary who must serve as a guardian of the rights of absent class members." 209 F.3d 43, 52 (2d Cir.2000) (internal quotation marks omitted); *see also id.* at 53 ("fee award[s] should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund" (citation omitted) (internal quotation marks omitted)).

Thus, a fee application in these circumstances—akin to an *ex parte* submission—requires that counsel proceed with the utmost care and transparency. *See* NYPRC 3.3(d) ("In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse"); *C.M. ex rel. P.M. v. Syosset Cent. Sch. Dist.*, 2013 WL 5799908, at *12 (E.D.N.Y. 2013), *report and recommendation adopted* 2013 WL 6157188 (E.D.N.Y.2013) (discussing "counsel's heightened duty and the court's solemn responsibilities" in comparable circumstances). In this case, however, plaintiff's counsel has approached the challenge not with the requisite transparency, but with opacity

Plaintiff's counsel initially filed it application for fees seeking 33% of the total settlement amount—$458,333—without providing contemporaneous time records

or even a high-level summary of the resources expended and hours worked. *See* DE 148. Rather, counsel pinned the application exclusively on the argument that "[t]he trend in this Circuit is toward the percentage method." DE 148-2 at 6 (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 121). Indeed, in a further effort to shield the sought-after percentage fee from scrutiny, the Settlement Agreement expressly provides that "Defendants agree that they will not oppose any petition for an award of attorneys' fees and costs," and "It is agreed that attorneys' fees shall be $458,333.00." Settlement Agreement (A)(5)(c).[5]

Counsel argues that its request for an attorneys' fee award of one-third of common fund "is consistent with the norms of class litigation in this circuit and what reasonable paying clients pay in contingency employment cases," citing nine cases containing language to that effect. *See* DE 148-2 at 3. However, as Judge Pauley correctly observed:

> there is reason to be wary of much of the caselaw awarding attorney's fees in FLSA cases in this circuit. Struck by extreme similarities in the wording of several decisions, this Court discovered that many of the authorities cited by Plaintiffs' counsel in support of their fee application are in fact proposed orders drafted by the class action plaintiffs' bar and entered with minimal, if any, edits by judges. Indeed, each of the four decisions mentioned above, the same authorities Plaintiffs cited in their brief, were proposed orders making findings

---

**5.** The Settlement Agreement further provides "Each party reserves the right to withdraw from this Agreement if (a) any portion of the Agreement is disapproved by this Court." Settlement Agreement (E)(1). Presumably, this does not apply to the amount of attorney's fees awarded, which must be calculated

by the Court. *Goldberger*, 209 F.3d at 53 ("fee award[s] should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund" (citation omitted) (internal quotation marks omitted)).

of fact and conclusions of law drafted by plaintiffs' counsel requesting their own fees.

\* \* \* \* \* \*

Orders drafted by counsel, especially those making findings of fact and conclusions of law that award counsel their own fees, should be given little precedential value. By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to. Because Westlaw and Lexis sweep every order of any significance into their databases, these form orders appear as if they were decisions by the judges who signed them. No wonder that "caselaw" is so generous to plaintiffs' attorneys.

*Fujiwara,* 58 F.Supp.3d at 436. Though scores of reported decisions state that a 33% fee is "typical," consistent with "norms of class litigation" or the "trend in the Second Circuit," most if not all appear to be the type of proposed findings described in *Fujiwara.*[6]

Therefore, the purported "trend" among district courts within the Circuit to award a flat 33 1/3% percentage fee in employment common fund class action cases, upon which plaintiffs' counsel relies, appears to be driven by plaintiffs' counsel seeking high payouts at the expense of silent class members, and ignores important precedential rulings. Most significantly, counsel in this case failed to even refer to the lodestar method or provide the data to support a lodestar calculation, urging instead that the Court rely exclusively on a percentage calculation. Such an approach runs contrary to binding precedent.

■ First, in *McDaniel v. County of Schenectady,* 595 F.3d 411 (2d Cir.2010), the Second Circuit expressly rejected an argument "to adopt the percentage method as the presumptive approach to fee awards or to abandon the lodestar approach altogether." 595 F.3d at 418 (noting that, in *Goldberger,* the Court "declined to 'junk' the lodestar method in favor of the presumptive or exclusive use of the percentage method"). The Court of Appeals explained that "neither the lodestar nor the percentage-of-fund approach to awarding attorneys' fees in common fund cases is without problems," and thus, "the decision as to the appropriate method [rests in] the district court which is intimately familiar with the nuances of the case." *Id.* at 418 (internal quotations omitted). Then, only several months later, in connection with the award of a "reasonable fee" under federal fee-shifting statutes, the U.S. Supreme Court held in *Perdue v. Kenny A. ex rel. Winn* that "the lodestar method yields a fee that is presumptively sufficient to achieve this objective." 559 U.S. 542, 552, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010); 29 U.S.C. § 216(b) (permitting award of "a reasonable attorney's fee").[7]

---

6. In this case, plaintiffs' counsel submitted a 15–page document entitled "[Proposed] Final Order and Judgment" for signature by the undersigned. DE 149–1. This document includes the following proposed findings, purportedly backed by string citations:

The Court finds that the amount of fees requested is fair and reasonable using the "percentage-of-recovery" method, which is consistent with the "trend in this Circuit." Class Counsel's request for 33 1/3% of the Maximum Settlement Amount is reasonable and "consistent with the norms of class litigation in this circuit."

*Id.* ¶¶ 34, 36. I disagree, and decline to execute the proposed final order and judgment as drafted.

7. In embracing the lodestar approach, *Perdue* expressly rejected the twelve factor test set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974), a formulation not dissimilar to the *Goldberger* factors. However, the Circuit has, at least

Contrary to the claims of counsel, it is beyond dispute that district courts must consider the attributes of the lodestar as compared to a percentage calculation in computing a reasonable attorneys' fee award.

Second, another problem with the suggestion that this Court blindly award counsel a third of the common fund lies in the fact that, even where a court employs the percentage method, it must "cross-check" the percentage fee award against the lodestar to ensure reasonability. *Wal–Mart Stores, Inc.*, 396 F.3d at 123; *Goldberger*, 209 F.3d at 50. "[U]nless time spent and skill displayed be used as a constant check on applications for fees there is a grave danger that the bar and bench will be brought into disrepute, and there will be prejudice to those whose substantive interests are at stake and who are unrepresented except by the very lawyers who are seeking compensation." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470–71 (2d Cir.1974).

Faced with this deficient submission for attorney's fees, the undersigned requested contemporaneous time records at the final fairness hearing on November 12, 2014. DE 157. Review of those records revealed dramatically different considerations: by counsel's calculation (more on that below), the lodestar method suggested a fee award of $248,256.25—just over half of the $458,333.00 sought by counsel. DE 155 at ¶ 12.[8] This Court's cross-check against the lodestar revealed that amounts sought represented "attorneys' fees many times greater than those that would have been earned under the lodestar of hourly rate multiplied by hours worked." *McDaniel*, 595 F.3d at 418–19. But for the Court's inquiry, the true nature fees sought would have been remained concealed from the Court and, worse yet, counsel's clients.

■ In any event, the Court must choose the correct method of calculating a fee. "The *Goldberger* factors are applicable to the court's reasonableness determination whether a percentage-of-fund or lodestar approach is used, and in the latter context, indicate whether a multiplier should be applied to the lodestar." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 423 (2d Cir.2010) (citation omitted). Those factors consist of the following: "(1) counsel's time and labor; (2) the litigation's magnitude and complexity; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.*

On balance, in this case, the *Goldberger* factors weigh strongly in favor of the lodestar approach rather than a percentage award. As discussed in greater detail below, the time expended (numbering only a few hundred hours)—as well as the somewhat dubious quality of the representation—suggest that a percentage approach would result in a windfall. As to magnitude, complexity and risk, the lodestar calculation adequately accounts for these fac-

---

implicitly, reaffirmed the continued viability of *Goldberger* in cases following *Perdue*. *See, e.g., In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 127 (2d Cir.2014); *Cassese v. Williams*, 503 Fed.Appx. 55, 58 (2d Cir.2012).

8. While counsel provided the total hours worked on the case, the contemporaneous time records failed to provide a summary that allowed the Court to adjust the reasonable hourly rate and the reasonable time spent for each attorney. Accordingly, the Court further issued an order directing plaintiff's counsel to provide a summary with "a list of individual attorneys and paraprofessionals for whom compensation is being sought, the total number of hours sought for that individual's work, and the individual's hourly rate." Order dated Jan 15, 2015. Counsel provided the summary by January 29, 2015. DE 160.

tors. For all of these reasons, the fifth factor—the requested fee in relation to the settlement—weighs in favor of the lodestar approach.[9] And the primary public policy consideration—incentivizing *capable* counsel to similar cases—is, at best, a neutral consideration factor given the history of this matter.

Based on a consideration of all of these factors, and the peculiar facts of this case, the undersigned employs the lodestar method in calculating the fee award. "Both [the Second Circuit] and the Supreme Court have held that the lodestar ... creates a 'presumptively reasonable fee.'" *Millea v. Metro–North R. Co.*, 658 F.3d 154, 166 (2d Cir.2011). "The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 174 (2d Cir.2009) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 112, 118 (2d Cir. 2007)) (internal quotations omitted). "Generally, to determine a reasonable attorney's fee, a court must calculate a 'lodestar figure,' which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Barbu v. Life Ins. Co. of N. Am.*, No. 12–CV–1629 JFB SIL, 2015 WL 778325, at *2 (E.D.N.Y. Feb. 24, 2015) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

## 2. *Examination of Counsel's Hours and Rates*

### Reasonable Hours

In a recent ruling, Judge Bianco set forth the standard for reasonable hours:

"The party seeking attorney's fees also bears the burden of establishing that the number of hours for which compensation is sought is reasonable." *Custodio v. Am. Chain Link & Const., Inc.*, No. 06–CV–7148 (GBD), 2014 WL 116147, at *9 (S.D.N.Y. Jan. 13, 2014) (citing *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994)). "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch [v. Fleet Street, Ltd.]*, 148 F.3d [149] at 173 [(2d Cir. 1998)]. "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Id.* (quoting *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983)); *see also Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir.1994) ("We do not require that the court set forth item-by-item findings concerning what may be

---

9. Notably, in comparing the requested fee in relation to the settlement, counsel trumpets the fact that the common fund amounts to $1.375 million, though that figure is a maximum and, hence, theoretical payout. In fact, by the time of the final settlement hearing, counsel was well aware that claims were filed by only 603 eligible claim members, and that of the net settlement (a calculation based on counsel's determination of the attorney's fee

amount), only $251,738.60 would be distributed to class members. DE 152 ¶ 6. This fact did not deter counsel from continuing to seek $458,333 in attorneys' fees. *See* DE 158. While this represents 33.3% of the theoretical recovery by the class, had the undersigned awarded this amount sought, such an award would constitute an effective attorneys' fee of approximately 182% of the actual payout to class members.

countless objections to individual billing items.").

*Barbu,* 2015 WL 778325, at \*5. In addition to eliminating unnecessary hours, courts may reduce the number of hours when presented with time entries that are lack sufficient specificity to permit reasoned review. *Id.; see also Annuity, Pension, Welfare & Training Funds of Int'l Union of Operating Engineers Local 14–14B, AFL–CIO v. Integrated Structures Corp.,* 2013 WL 4095651, at \*12 (E.D.N.Y. Aug. 13, 2013) (holding that courts must "apply across-the-board reductions for vague entries").

 Counsel claims that it expended a total of 653 hours litigating this matter. DE 155–7 at 2. However, an examination of the hours claims reveals a significant quantum of time expended on matters that were unnecessary, inappropriate and, in certain instances, antithetical to the efficient and professional resolution of this matter. The inclusion of such hours runs contrary to counsel's duty in such matters. "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The most significant issue contained in the time records involve the *Plume* action. The Frank firm, by Mr. Romero, in what could well be viewed as a breach of professional responsibility, filed a notice of appearance on behalf of the plaintiff-objectors in their separate action. *See Plume,* No. 14–cv–4213 (GRB), DE 6; *see also* NY ST RPC Rule 1.7. Astonishingly, at the fairness hearing, it became clear that Romero played a role in preparing the

objections on behalf of the plaintiff-objectors to the very settlement at issue on this motion. *See* DE 157 at 29:16–21. The following colloquy occurred during the final fairness hearing:

MR. TILTON: .... First of all, **Mr. Romero entered into an agreement with my firm to represent Nick Plume and Alexandra Devino and filed notice of appearance on their behalf in their own case. He is currently their attorney and is going against their wishes, # 1. # 2, he participated in the drafting of the objections with me.** We emailed drafts back and forth.

MR. ROMERO: That isn't correct.

MR. TILTON: **He gave suggested changes to the objections and we spent hours on the phone discussing the arguments to be made. Now he is opposing those objections,** which I find less than unprofessional, put it that way.

THE COURT: **I'm sorry, are you suggesting to me that Mr. Romero helped you write the objections?**

MR. TILTON: **He absolutely did.**

MR. ROMERO: That is incorrect, Your Honor.

MR. TILTON: No, that is not incorrect. We have emails back and forth with the drafts where you suggested language. We had hours—phone calls numerous times where he suggested the cases I used, the arguments to be made, in other words, the basis for the argument. I then drafted the memorandum of law and sent it to Mr. Romero for his approval, and we have three to four emails back and forth with different drafts.

THE COURT: **Mr. Romero, do you want to help me with that one?**

MR. ROMERO: I don't agree with that characterization, Your Honor. **While I was in vacation in New Jersey in the month of August, Mr. Tilton sent me**

a draft of what he intended to file. We talked about it on the phone and then we filed it. I was in New Jersey at the time on vacation, Your Honor.

DE 157 at 28–29 (emphasis added). The Frank firm and Mr. Romero remained counsel of record to the plaintiff-objectors until the filing of a motion to withdraw as attorney six days before the final fairness hearing. *Plume*, No. 14–cv–4213 (GRB), DE 20. Judge Seybert granted the motion to withdraw as attorney on the day of the final fairness hearing. *Id.* at DE 21.

That Mr. Romero negotiated a settlement on behalf of the class, then helped draft objections to that settlement on behalf of certain class members and, finally, reversed positions again to argue against those objections is most troubling. Worse yet, in the time records submitted by plaintiffs' counsel to this Court, Mr. Romero has the unbridled temerity to bill for hours spent consulting on objections to the very settlement he negotiated on behalf of the class. *See generally* DE 158. The time records show that he billed for phone calls and emails with Mr. Tilton. DE 155–3. Also contained in the time records are charges of at least $3,375 for time expended on the *Perez* case, a tangentially related state court action. DE 155–3. *Id.*

Mr. Romero provides numerous entries for tasks plainly inappropriate for a law firm partner. For example, the time records reveal many hours of time billed by Mr. Romero for "filing" the consent forms of individual opt-in plaintiffs. *See generally* DE 155 (time entries dated 10/16/12 to 10/17/12). Mr. Romero improperly charged a quarter hour for each consent form so filed, even when he filed many on the same day. Such work is clearly more appropriately assigned to one of the paralegals on the case—who presumably could file them faster than the rate of four per hour. *In re KeySpan Corp. Sec. Litig.*, No. 01–CV–5852 (ARR), 2005 WL 3093399, at *16 (E.D.N.Y. Sept. 30, 2005) (quoting *In re Twinlab Corp. Sec. Litig.*, 187 F.Supp.2d 80, 87 (E.D.N.Y.2002) (finding claimed lodestar to be excessive because counsel calculated the lodestar using partner billing rates for a large percentage of the time worked on the case, "regardless of whether an associate or a paralegal could have performed the work at a fraction of the price")).

Additionally, the contemporaneous time records contain primarily vague and unilluminating entries. Many of the hours billed are attributed to tasks such as "Review transcript," "Review files," "Review/Meeting," "Meet with client," "Call adversary," "Memo to file," "Call to client," "Organize file," and, most notably, an enigmatic entry dated September 25, 2012 reading only "Memo re:." DE 155–1. These entries—and the records taken as a whole—fail to provide sufficient information to permit review for reasonableness. In sum, the Court has uncovered time entries attributed to matters that were plainly inappropriate, as well as a pervasive failure to provide sufficient data to evaluate the remaining entries.[10] The inclusion of non-compensable time combined

---

10. Such unprofessional billing practices by the Frank firm are fully consistent with similar actions by the firm in other recent matters handled by the undersigned and other judges of this Court. *See, e.g., Badalamenti v. Country Imported Car Corp.*, No. CV 10–4993 GRB, 2015 WL 1862854, at *4 (E.D.N.Y. Apr. 23, 2015) (citing "extraordinary circumstances in [a] fee application" by the Frank firm including "unreliable and contradictory information, . . . fees for matters that are clearly not compensable and fluctuating rates and hours"); *Rodriguez v. Pie of Port Jefferson Corp.*, No. CV 14–0519 LDW GRB, 2015 WL 1513979, at *1 (E.D.N.Y. Mar. 13, 2015) (finding firm's conduct "highly unprofessional"); *Badalamenti v. Country Imported Car Corp.*, No. CV–10–4993 SJF WDW, 2012 WL

with pervasively vague time entries requires that the Court significantly reduce the hours presented by plaintiffs' counsel.

To account for these impermissible and unascertainable charges, the Court applies an across-the-board reduction of 33% for the hours claimed by plaintiffs' counsel. Courts within this district have previously granted such across-the-board reductions for vagueness. *See, e.g., Barbu,* 2015 WL 778325, at *5; *Annuity, Pension, Welfare & Training Funds of Int'l Union of Operating Engineers Local 14–14B, AFL–CIO,* 2013 WL 4095651, at *12. Thus, the total compensable hours shall be calculated at 435 hours, rather than the 653 hours sought.

### a. Reasonable Hourly Rate

"[T]he applicant for a fee has [the] burden of showing that the claimed rate and number of hours are reasonable." *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). On this application, counsel for plaintiffs seek the following hourly rates: $550 for partner Neil M. Frank, $450 for partner Peter A. Romero, $300 for former associate Jose Santiago, $300 for associate Scott Laird, $300 for associate Edward Sample, $300 for associate Andrea Batres, $275 for associate Andrea Tarazi, $175–250 for associate David Barnhorn, $150 for law clerk Louis Leon, and $75 for paralegal Tony Rosas. DE 160 at ¶ 9. These rates differ dramatically from the rates sought by the Frank firm for the some of the same attorneys in other similar pending cases before this Court, including *Badalamenti* and *Sanchez,* as demonstrated in the table below:

| Name | Title | Badalamenti[11] | Sanchez | Instant Application |
|------|-------|-----------------|---------|---------------------|
| Neil M. Frank | Partner | $400 | $375 | $550 |
| Peter A. Romero | Partner | $375 | $300 | $450 |
| Edward Sample | Associate | $275 | — | $300 |
| Jose Santiago | Associate | $250 | — | $300 |
| Andrea Batres | Associate | — | $200 | $300 |
| David Barnhorn | Associate | $200 | — | $175–250 |

Counsel fails to explain these hourly rate variations—which range as high as 50%. *See Fujiwara,* 58 F.Supp.3d at 437–38 (noting that "these rates are untested by the marketplace" and "[w]hen no client pays by the hour, it is an easy matter to reduce a lodestar multiplier by increasing your 'rate.' ").

The delta in the hourly rates sought by counsel in these highly similar matters raises a perplexing problem. In discussing the history of fee application case law, the Second Circuit has observed "the lodestar was the product of the attorney's *usual* hourly rate and the number of hours worked." *Arbor Hill,* 522 F.3d at 186 (emphasis added). However, because this review of its application suggests that the firm is seeking something other than its usual rate—or indeed, that such a usual

6061639, at *8 (E.D.N.Y. Dec. 5, 2012) (imposing monetary sanction on firm); *McFadden v. Clarkeson Research, Inc.,* No. 08–CV–5187 JS WDW, 2011 WL 1674887, at *5 (E.D.N.Y. May 2, 2011) (denying attorneys' fees to Frank firm, based, in part, on inappropriate conduct including "vulgar and unprofessional threat Plaintiff's counsel made to Defendant").

11. In *Badalamenti v. Country Imported Car Corp.,* these rates reflect the Frank firm's initial hourly rate requests. In that case, counsel inexplicably sought to increase requested rates by up to 37.5% in a summary of time records submitted under the penalty of perjury. *Badalamenti,* 2015 WL 1862854, at *3.

rate cannot be identified—other measures must be employed to calculate the lode-star. *See Badalamenti,* 2015 WL 1862854, at *5 (retroactive rate adjustments by Frank firm within the context of a single case, among other factors, rendered lode-star calculation impossible).

The rates sought by the Frank firm are significantly higher than hourly commonly awarded by judges in this district—including rates awarded to the very same lawyers at the firm. *Barbu,* 2015 WL 778325, at *3 (E.D.N.Y. Feb. 24, 2015) ("Courts have awarded rates of $200 to $400 per hour for partners in this district."); *Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor–Mgmt. Co-op., Pension & Welfare Funds v. Flooring Experts, Inc.,* No. 12–CV–6317 ADS AKT, 2013 WL 4761151, at *9 (E.D.N.Y. Sept. 3, 2013) (partners awarded $200–375 per hour); *In re Certain–Default–Motions Brought o/b/o Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor–Mgmt. Coop., Pension & Welfare Funds,* 2015 WL 968125, at *10 (E.D.N.Y. Feb. 27, 2015) *report and recommendation adopted,* 2015 WL 1247085 (E.D.N.Y. Mar.18, 2015) and 2015 WL 1396475 (E.D.N.Y. Mar. 25, 2015) ("[R]easonable fees in this district vary from $100 to $295 per hour for associates and up to $90 per hour is a reasonable fee for legal assistants." (citation omitted) (internal quotation marks omitted)); *Joseph v. HDMJ Restaurant, Inc.,* 970 F.Supp.2d 131, 156 (E.D.N.Y.2013) (reducing Neil Frank's requested hourly rate from $500.00 to $350.00, Peter Romero's rate from $450.00 to $275.00, Edward Sample's rate from $300.00 to $200.00, and David Barnhorn's rate from $175.00 to $140.00).; *Trs. of Empire State Carpenters Annuity, Ap-*

*prenticeship, Labor–Mgmt. Cooperation, Pension & Welfare Funds v. FMC Constr.,* 2014 WL 1236195, at *4 (E.D.N.Y. Mar. 25, 2014) (associate hourly rates between $100 and $295; paralegal awarded $90 per hour). Under the forum rule, "district courts should use the 'prevailing [hourly rate] in the community,'" which has been defined as "the district where the district court sits." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections,* 522 F.3d 182, 190 (2d Cir.2008).[12]

■ Because I regard the rates claimed by counsel as an unreliable reflection of an appropriate hourly rate, the only question is where within the range of rates generally paid in this district the rates should fall. "The reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill,* 522 F.3d at 190. The Court of Appeals went on to explain:

> In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

*Id.*

Counsel's unusual, if not unique behavior, begs the question: how much would a

---

**12.** While it is true that "a lawyer may be paid at different rates for otherwise indistinguishable service," *A.R. ex rel. R.V. v. New York City Dep't of Educ.,* 407 F.3d 65, 80 (2d Cir. 2005), the cases discussed above are both substantively comparable to the instant case and involve work in the same geographic area.

reasonable paying client be willing to pay? In considering this question, one must account for the fact that, among other things, plaintiffs' counsel attempted to charge its clients (1) a higher hourly rate than it has charged similarly-situated clients; (2) for time spent working on matters irrelevant to, and in one instance, contrary to the clients' interest; and (3) a percentage based award inconsistent with both law and fact, while attempting to conceal relevant facts from the Court and the plaintiffs. Under such circumstances, one could posit the notion that a client would not engage the Frank firm, or having done so, would simply refuse to pay. However, to satisfy the public policy of incentivizing attorneys to accept cases and in light of the fact that a favorable outcome was achieve, some fee award is warranted. *Goldberger*, 209 F.3d at 51 ("There is also commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest"); *Badalamenti*, 2015 WL 1862854, at *7 (awarding attorney's fees even though lodestar was impossible to calculate because of ERISA's policy that encourages beneficiaries to enforce their statutory rights).

Certainly in the case of Mr. Romero—who logged the greatest number of hours on the case and engaged in the most troubling conduct—an hourly rate at the very bottom of the range generally awarded to partners is called for—to wit: $200 per hour. It would, however, be unfair to impute his conduct to the other lawyers involved. An examination of the backgrounds of Santiago, Laird, Batres and Tarazi (as well as this Court's familiarity with some of their work in this and other matters) suggests that a $200 hourly rate is appropriate. *See* DE 155–5 to –7; 156; 160. Consistent with Judge Tomlinson's ruling in *Joseph*, Frank, Sample and Barnhorn will be awarded $350, 200 and $140, respectively. Leon, a law school graduate listed as a "law clerk," will be paid the top paralegal rate of $90, while Rosas will receive the requested hourly rate of $75.

■ After the adjustment of hours and rates outlined above, I find that the following an appropriate lodestar calculation in this case:

| Professional | Reasonable Hours | Reasonable Hourly Rate | Lodestar Figure |
| --- | --- | --- | --- |
| Neil M. Frank | 35.6775 | $350.00 | $12,487.13 |
| Peter A. Romero | 231.485 | $200.00 | $46,297.00 |
| Jose Santiago | 4.8575 | $200.00 | $971.50 |
| Scott Laird | 0.1675 | $200.00 | $33.50 |
| Edward Sample | 1.005 | $200.00 | $201.00 |
| Andrea Batres | 145.6245 | $200.00 | $29,124.90 |
| Andrea Tarazi | 5.762 | $200.00 | $1,152.40 |
| David Barnhorn | 12.864 | $140.00 | $1,800.96 |
| Louis Leon | 2.814 | $90.00 | $253.26 |
| Tony Rosas | 8.71 | $75.00 | $653.25 |
| | | Total | $92,974.90 |

Therefore, the lodestar amounts to $92,974.90.

**Awarding a Multiplier**

■ Since counsel initially advocated for award of one-third of the common fund, and did not provide any of the data to

support a lodestar calculation, the motion did not seek a multiplier. However, counsel belatedly sought a multiplier after the Court requested a lodestar submission. DE 155–7 at 2.

Counsel claims that "[c]ourts regularly award lodestar multipliers from two to six times the lodestar." *Id.* at 2–3 (citing cases). This assertion is undercut by applicable Second Circuit and U.S. Supreme Court precedent. The Court of Appeals held that the lodestar figure should not be adjusted, absent "rare circumstances" because the "lodestar figure [already] includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." *Millea*, 658 F.3d at 167. Furthermore, the U.S. Supreme Court has unequivocally held that a multiplier is appropriate only in rare and exceptional circumstances:

> In this case, we are asked to decide whether either the quality of an attorney's performance or the results obtained are factors that may properly provide a basis for an enhancement. We treat these two factors as one. When a plaintiff's attorney achieves results that are more favorable than would have been predicted based on the governing law and the available evidence, the outcome may be attributable to superior performance and commitment of resources by plaintiff's counsel. Or the outcome may result from inferior performance by defense counsel, unanticipated defense concessions, unexpectedly favorable rulings by the court, an unexpectedly sympathetic jury, or simple luck. Since none of these latter causes can justify an enhanced award, superior results are relevant only to the extent it can be shown that they are the result of superior attorney performance. Thus, we need only consider whether superior attorney performance can justify an enhancement. And in light of the princi-

ples derived from our prior cases, we inquire whether there are circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation. We conclude that there are a few such circumstances but that these circumstances are indeed "rare" and "exceptional," and require specific evidence that the lodestar fee would not have been "adequate to attract competent counsel."

*Perdue*, 559 U.S. at 554, 130 S.Ct. 1662. In the wake of *Perdue*, it is difficult to reconcile the cases cited by defendants suggesting that multipliers are "regularly" awarded, *see, e.g.*, *Sewell v. Bovis Lend Lease, Inc.*, No. 09 CIV. 6548 RLE, 2012 WL 1320124, at *13 (S.D.N.Y. Apr. 16, 2012) ("Courts commonly award lodestar multipliers between two and six"). Most of the cases cited by counsel supporting the supposedly "regular" award of large lodestar multipliers appear to bear the same characteristics of the "percentage trend" decisions discussed in *Fujiwara*. In fact, one court has observed that the *Sewell* case, cited by counsel here, may have been the product of the same practices by counsel. *See Ortiz v. Chop't Creative Salad Co. LLC*, 89 F.Supp.3d 573, 597–98, 2015 WL 778072, at *19 (S.D.N.Y. Jan. 16, 2015) (citing *Sewell* and noting that "the practice of the plaintiffs' counsel about which the *Fujiwara* court was wary is also present here").

In any event, the *Goldberger* analysis set forth above, applies with equal force to the question of a multiplier. Notably, the risk of success is " 'perhaps the foremost' factor to be considered in determining whether to award an enhancement," *Goldberger*, 209 F.3d at 54, but, as noted, the risk of success here—which in the FLSA context, often turns on the question of collectability, was not significant. *Fujiwara*, 58 F.Supp.3d at 435 ("This does not appear to

have been a particularly risky litigation. In most cases, obligations under the FLSA and NYLL are relatively clear and liability turns on factual issues.") The relatively large size of the settlement cannot, in any way, be attributed to "superior attorney performance," but is rather attributable to fortuity and circumstance. As the Court held in *Goldberger*:

> a big recovery does not necessarily justify a quality multiplier. As cautioned in *Grinnell II:* "a large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel."

*Goldberger*, 209 F.3d at 56. Thus, there are no factors warranting a multiplier.

### 3. Costs

■ "Courts typically allow counsel to recover their reasonable out-of-pocket expenses." *Viafara v. Mciz Corp.*, No. 12 Civ. 7452(RLE), 2014 WL 1777438 (S.D.N.Y. May 1, 2014). Here, plaintiffs' counsel claims $2,135.85 in costs for filing fee, process server, photocopies, fax, and travel. DE 155–4. These costs appear reasonable, and the Court awards $2,135.85 in costs.

### 4. Administration Fees

■ Courts within this district have awarded up to $50,000 for the settlement claims administrator. *Ebbert v. Nassau Cnty.*, No. CV 05–5445 AKT, 2011 WL 6826121, at *19 (E.D.N.Y. Dec. 22, 2011). Here, the case manager of the claims administrator submitted a sworn declaration for total costs for services in connection with administration of this settlement, including fees incurred and anticipated future costs for completion of the administration is $33,500.00. DE 152 at 1–2. Plaintiffs' requested administration fees

are reasonable, and thus, the Court awards $33,500.00 in administration fees.

### 5. Service Awards

■ "Service awards are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Viafara*, 2014 WL 1777438, at *16. Plaintiffs request an award of $10,000 to plaintiff Elmer Flores for his service to the class. A service award of $10,000 is reasonable, and well within service awards granted in this district. *See Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012). Accordingly, the Court awards $10,000 to plaintiff Elmer Flores for his service to the class.

### CONCLUSION

For the reasons set forth herein, the Court hereby grants:

1. final approval the FLSA class action settlement;

2. the request for a service award to plaintiff Elmer Flores of $10,000;

3. the reimbursement of $2,135.85 in litigation costs and expenses;

4. the award of $33,500 in administration fees to Settlement Administrator, Simpluris, Inc.

5. awards plaintiffs' counsel the sum of $92,974.90 in attorney's fees. Counsel shall not be permitted any other fees in connection with this action.

The parties are directed to modify the Settlement Agreement to fully reflect the matters discussed herein, and submit a proposed final judgment in accord with

this memorandum and order within two weeks.

**SO ORDERED.**